**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ANN OUTTEN,                                          :
                                                    :        CIVIL ACTION
           Plaintiff,               :
                                                    :
      v.                                            :
                                                    :        NO. 13-4708
GENESIS HEALTH CARE, LLC, et al.        :
                                                    :
           Defendants.            :

**MEMORANDUM**

BUCKWALTER, S. J.                                                      August 12, 2014

Pending before the Court is Defendants Genesis Health Care, LLC and 1245 Church

Road Operations, LLC, d/b/a/ Hillcrest Center ("Defendants")'s Motion for Summary Judgment.

For the following reasons, Defendants' Motion is granted.

# I.  FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff Ann Outten ("Plaintiff") is an individual residing in Warrington, Pennsylvania.

(Compl. ¶ 7.)  Defendant Genesis Health Care, LLC ("Genesis") is a business providing nursing

and rehabilitative care with its headquarters in Kennett Square, Pennsylvania.  (Id. ¶ 8.)

Defendant 1245 Church Road Operations, LLC, d/b/a/ Hillcrest Center ("Hillcrest") is a business

providing nursing home related services in Wyncote, Pennsylvania.  (Id. ¶ 9.)

Plaintiff is sixty years old.  (Id. ¶ 12.)  She suffers from diabetes, hypertension, diabetic

peripheral neuropathy, osteoarthritis, gouty arthritis, chronic kidney disease, herniated and

bulging discs in her cervical and lumbar spine, and nodules in her lungs.  (Pl.'s Resp. Opp'n

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

Mot. Summ. J., Ex. A, Deposition of Plaintiff, March 12, 2014 ("Plaintiff Dep."), 41:3–42:1.)

Plaintiff worked continuously for Defendants as a registered nurse beginning in January of 1990.

(Id. at 18:3–8.)

### 1.  Defendants' Policies and Practices

Defendants' employee handbook sets forth detailed graded disciplinary measures for

certain workplace misconduct. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. O, Employee Handbook.)

According to the handbook, three "unscheduled absences" in ninety days merits "Verbal

Counseling." (Id.) The first offense of "no call/no show" carries with it a penalty of "Automatic

Written Final Counseling." (Id.) A second "no call/no show" results in "Termination of

Employment." (Id.) "Job abandonment" is deemed "Grounds for Immediate Dismissal." (Id.)

It is Defendants' practice not to permit personnel to miss work on account of weather.

(Def.'s Mot. Summ. J., Ex. D, Deposition of Susan Pagliaro, Mar. 19, 2014 ("Pagliaro Dep."),

25:3–15; Ex. E, Deposition of Patti Dollase, Mar. 14, 2014 ("Dollase Dep."), 18:7–15; Ex. R,

Deposition of Amy Heivly, Mar. 19, 2014 ("Heivly Dep."), 10:8–14.) In the event of dangerous

weather conditions, Defendants expect their employees to "either stay at work, come in early,

sleep over . . . [m]ake whatever contingency plans [they] have to make" in order to work their

shifts. (Dollase Dep. 18:7–15.)

### 2.  Events of 2011-2012

As of 2011, Plaintiff was a nursing supervisor on the night shift at Hillcrest, usually

working from 11:00 p.m. to 7:00 a.m. on weekdays and 7:00 p.m. to 7:00 a.m. on weekends.

(Plaintiff Dep. 20:6–21:17.) In her position as nursing supervisor for the night shift, Plaintiff

was responsible for the operations of an eighteen-bed dementia unit and charged with

supervising the other thirteen-to-fourteen employees working during the night shift. (Id. at

2

21:1–23.) Plaintiff reported to Susan Pagliaro ("Pagliaro"), the director of nursing, and Patti Dollase ("Dollase"), the assistant director of nursing. (Id. at 27:23–28:3, 29:16–30:20.) In the period between March 5, 2011 and March 5, 2012, Plaintiff used the sick time allotted to her. (Id. at 130:13–17.) At some point in or around 2011, Pagliaro mentioned that Plaintiff "may want to consider retiring." (Id. at 165:5–166:3.) Plaintiff responded by saying that she could not retire. (Id. at 166:16–19.) On March 5, 2012, Pagliaro issued Plaintiff her annual performance review, rating her "exceptional" in six categories out of seven. (Pl.'s Mot. Summ. J., Ex. J, Plaintiff Performance Review.) In the "Performance Objectives" section of the review, Pagliaro instructed Plaintiff to "decrease call-outs" and "work on care of self." (Id.)

On January 21, 2012, Katelyn Kirchoff, a registered nurse at Hillcrest, called out of work during a snowstorm. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex N, Kirchoff Individual Performance Improvement Plan.) Despite Kirchoff's representation that she was sick and "wasn't aware of the weather forecast," Kirchoff received a written reprimand for missing work because "Genesis policy does not permit call-outs during snow or forecast of snow." (Id.)

Sometime in early 2012, Plaintiff asked Defendants if they would provide her a chair with greater lumbar support due to herniated and bulging discs in her lumbar and cervical spine. (Id. at 65:24–68:21.) Defendants did not provide Plaintiff such a chair. (Id.)

### 3. Plaintiff's Surgery and Recovery

In late March or early April 2012, Plaintiff requested a leave of absence from Pagliaro under the Family Medical Leave Act ("FMLA"). (Id. at 75:15–76:10.) Specifically, Plaintiff required time off to undergo and recover from kidney surgery due to chronic kidney disease and the need to remove a kidney stone. (Id. at 41:3–42:1, 76:10–76:20.) Defendants granted Plaintiff FMLA leave from April 13, 2012 through May 31, 2012. (Def.'s Mot. Summ. J., Ex.

3

N, Designation Notice.)  Plaintiff could not return to work on May 31, 2012 because her

condition required a second kidney surgery.  (Plaintiff Dep. 75:23–76:6; Pl.'s Resp. Opp'n Mot.

Summ. J., Exs. O–Q, Disability Medical Updates.)  Plaintiff underwent a second kidney surgery

on July 12, 2012.  (Plaintiff Dep. 97:9–17.)  Plaintiff took nearly four more months of FMLA

leave as a result of her surgeries.  (Id. at 75:23–76:6.)  In September 2012, Plaintiff had a phone

conversation with Pagliaro in which Pagliaro brought up the subject of Plaintiff's possible

retirement.  (Id. at 166:6–19.)  Plaintiff told Pagliaro that she could not retire.  (Id.)  Plaintiff

returned to work from her FMLA leave on September 28, 2012.  (Id. at 100:8–10.)

### 4.    Hurricane Sandy and Plaintiff's Termination

On October 28, 2012 through the morning of October 29, 2012, Plaintiff worked the

night shift from 7:00 p.m. to 7:00 a.m. as the on-duty registered nurse supervisor at Hillcrest.

(Plaintiff Dep. 136:4–21.)  That evening, eastern Pennsylvania experienced high winds and

torrential rain due to Hurricane Sandy.  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. K, News Report

of Oct. 28, 2012.)  Over the course of her shift, Plaintiff received multiple phone calls from

employees attempting to call out on account of the hurricane.  (Plaintiff Dep. 136:4–138:15.)

Plaintiff had received instructions "not to accept call-outs" consistent with her prior experience

of refusing call-outs during snowstorms.  (Id. at 139:4–140:8.)  Pursuant to Plaintiff's

understanding of Defendants' practices regarding inclement weather, she told employees calling

out due to Hurricane Sandy that "we were not accepting call-outs."  (Id. at 139:4–8.)

After her shift ended at 7:00 a.m., Plaintiff drove home, arriving at around 7:30 a.m.  (Id.

at 140:15–19.)  Plaintiff did not leave the house between 7:30 a.m. and 8:30 p.m.  (Id.)  At

around 8:30 p.m., Plaintiff called Hillcrest and spoke with the nurse supervisor on duty,

informing her that she would not be reporting for her scheduled night shift of October 29–30,

4

2012. (Id. at 143:12–145:19.)  Plaintiff explained that, in her view, driving to work in the storm "was not a prudent thing to do."  (Id.)  Plaintiff had not attempted to come to work prior to calling Hillcrest.  (Id.)

Roughly ten minutes after her brief conversation with the on-duty nursing supervisor, Plaintiff received a phone call from Dollase.  (Id. at 145:4–19.)  Plaintiff reiterated to Dollase that she believed "it was too dangerous for [her] to come in" for her shift.  (Id.)  Dollase told Plaintiff that, due to the nature of Hillcrest's work as around-the-clock health care providers, "everyone has a personal responsibility to get in," and that this was especially true for Plaintiff who, as a supervisor, was held "to a higher standard."  (Dollase Dep. 21:15–22:3.)  After Plaintiff repeated her reason for staying home, Dollase told Plaintiff "there would be consequences."  (Plaintiff Dep. 146:21–24; Dollase Dep. 23:2–8.)

For the next two days, Dollase conferred with Pagliaro about "how to handle" Plaintiff's failure to report for work on the night of October 29, 2012, "trying to weigh all our options" and "try[ing] to find some way that we could get around not terminating [Plaintiff] and still maintain credibility with our staff."  (Dollase Dep. 27:23–29:10.)  On November 1, 2012, Dollase and Pagliaro decided that Plaintiff's conduct constituted "job abandonment."  (Def.'s Mot. Summ. J., Ex. T, Plaintiff's Performance Improvement Plan.)  On November 1, 2012, consistent with the prescribed disciplinary measure for "job abandonment" in the employee handbook, Pagliaro and Dollase terminated Plaintiff.  (Employee Handbook; Plaintiff's Performance Improvement Plan.)

### 5.  Other Employees Who Missed Work During Hurricane Sandy

Including Plaintiff, sixteen of Defendants' employees from the nursing department at Hillcrest failed to report to work during Hurricane Sandy.  (Pl.'s Resp. Mot. Summ. J., Ex. H, Defs.' Resps. to Pl.'s Sec. Set of Interrogs.)  Of the other fifteen employees, thirteen were

nursing assistants, one was a licensed practical nurse, and one was a clinical reimbursement coordinator. (Id.) None of the fifteen was a registered nurse and all were subordinate to Plaintiff. (Id.; Defs.' Mot. Summ. J., Ex. C, RN Supervisor Job Description.) Defendants disciplined seven employees for missing work during Hurricane Sandy, with five receiving written reprimands and two being terminated. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. I, Individual Performance Improvement Plans.) Jenee Evans, a nursing assistant, was terminated for being a "no show/no call" on October 26 and October 29, 2012. (Id.; Defs.' Resps. To Pl.'s Sec. Set of Interrogs.) Sharee Jefferson, a nursing assistant, was terminated after she called out during Hurricane Sandy on October 30, 2012, and had previously called out a total of eighteen times and was late twenty-six times in 2012. (Id.)

After Plaintiff's termination, registered nurse Manju Bobby ("Bobby") "stepped into [Plaintiff's] position." (Dollase Dep. 54:14–22.) Bobby had previously served as a sort of "substitute alternative supervisor" and, according to Defendants, continues to cover Plaintiff's previous shifts "until a permanent replacement is hired." (Id.; Defs.' Resps. to Pl.'s Sec. Set of Interrogs.) Defendants hired Bobby in 2011. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. Q, Bobby Personnel Records.) Bobby is twenty-two years younger than Plaintiff and has never requested a disability-related accommodation from Defendants. (Id.; Defs.' Resps. to Pl.'s Sec. Set of Interrogs.)

### 6.    Procedural History

Plaintiff initiated the present litigation on August 13, 2013. After some initial motion practice and two amended complaints, Plaintiff filed a Third Amended Complaint on March 20, 2014 setting forth four causes of action against Defendants: (1) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; (2) violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; (3) violation of the Pennsylvania Human

Relations Act ("PHRA"), Pa. C.S. § 951 et seq.; and (4) interference and retaliation under the

Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 et seq.  Defendants filed a Motion for

Summary Judgment on April 14, 2014.  Plaintiff filed her Response on April 22, 2014.

Defendants filed their Reply on May 5, 2014.  The motion is now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a

reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and

decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of

Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-

Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow

Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence

presented by both sides, the court must accept as true the allegations of the non-moving party,

and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## III.   DISCUSSION

Defendants move for summary judgment on Plaintiff's ADA, ADEA, and PHRA claims on the ground that Plaintiff has not produced sufficient evidence from which a reasonable factfinder can conclude that terminating Plaintiff due to "job abandonment" was a pretext for unlawful discrimination. Defendants similarly move for summary judgment on Plaintiff's FMLA claims, arguing that Plaintiff has not made neither a prima facie case of FMLA interference or retaliation nor a showing from which a reasonable factfinder could find pretext. Plaintiff responds that her claims can survive summary judgment because she has shown that Defendants treated her disparately from similarly situated co-workers and, thus, should be permitted to proceed to trial on her claims. After carefully reviewing the parties' arguments and the evidentiary record in this case, the Court cannot find that Plaintiff has met her burden on any of her claims and, as such, Defendants are entitled to summary judgment.

8

## A.    Plaintiff's ADA, ADEA, and PHRA Claims

Plaintiff claims that in terminating her, Defendants unlawfully discriminated against her

on the basis of age and disability under the ADA, the ADEA, and the PHRA.  In the absence of

any direct evidence of unlawful discrimination by Defendants, each of these claims is to be

evaluated under the burden-shifting framework that the Supreme Court set forth in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Hazen Paper Co. v. Biggins, 507 U.S.

604, 612 (McDonnell Douglas framework is "applicable to [the] ADEA"); Ostrowski v. Con-

Way Freight, Inc., 543 F. App'x 128, 130 (3d Cir. 2013) (applying McDonnell Douglas to ADA

and PHRA claims); Fasold v. Justice, 409 F.3d 178, 183–84 (3d Cir. 2005) (applying McDonnell

Douglas to ADEA and PHRA claims).  Under the McDonnell Douglas framework, a plaintiff

must first make a prima facie case of age discrimination by showing that he or she "(1) is a

member of the protected class, . . . (2) is qualified for the position, (3) suffered an adverse

employment decision, and (4) in the case of a demotion or discharge, was replaced by a

sufficiently younger person to create an inference of age discrimination."  Simpson v. Kay

Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643–44 n.5 (3d Cir. 1998) (internal citations

omitted) (see also Ostrowski, 543 F. App'x at 130 (3d Cir. 2013) (to show prima facie disability

discrimination "the plaintiff must demonstrate that he has a 'disability' within the meaning of the

ADA, that he is a 'qualified individual,' and that 'he has suffered an adverse employment action

because of that disability.'") (citing Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d

Cir. 2006)).  If the plaintiff makes a prima facie showing, "the burden shifts to the employer to

produce evidence of a legitimate, nondiscriminatory reason for the adverse decision."  Simpson,

142 F.3d at 643–44 n.5.  Once the defendant employer has articulated a "legitimate,

9

nondiscriminatory reason," the burden shifts back to the plaintiff to show that "the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." Id.

To make a showing of pretext sufficient to survive summary judgment in an employment discrimination case, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Under the "motivating or determinative cause" theory, a plaintiff must show "that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson, 142 F.3d at 644–45 (citing Fuentes, 32 F.3d at 765).

This standard requires more than a showing that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (internal citations omitted).

Defendants concede, for purposes of their Motion, that Plaintiff can make a prima facie case of age and disability discrimination, and state that they terminated Plaintiff for "job abandonment." Having articulated their "legitimate, nondiscriminatory reason" for terminating Plaintiff, Defendants argue that Plaintiff cannot show pretext because it is undisputed that

10

Plaintiff engaged in the conduct that precipitated her termination and Plaintiff cannot point to any evidence of disparate treatment of "similarly situated" employees. Plaintiff responds that between (1) Defendants' disciplinary decisions about other employees who missed work due to weather and (2) the graded punishments for unexcused absences appearing in Defendants' employee handbook, she can produce evidence of pretext such that a factfinder could reasonably either "disbelieve the employer's articulated legitimate reasons" or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. The Court will address each item of Plaintiff's purported evidence of pretext separately.

### 1.    Defendants' Treatment of Plaintiff Compared to Other Employees

#### a.    Defendants' Treatment of Other Employees Who Called Out During Hurricane Sandy

Plaintiff argues that she can show that Defendants' stated reason for terminating her is a pretext for age and disability discrimination because she was treated disparately from her "similarly situated" younger, non-disabled co-workers who have missed work due to weather. Specifically, Plaintiff argues that among the sixteen of Defendants' employees who missed work during Hurricane Sandy, she was the only one terminated "due to Hurricane Sandy alone." In addition, she asserts that because on one other occasion another registered nurse received only a written reprimand for missing work during a snowstorm, she can show "job abandonment" to be a pretext. (Pl.'s Mem. Supp. Resp. Opp'n Mot. Summ. J. 10–11.) Defendants contend that "none of the other individuals from the Nursing Department who failed to report to work during Hurricane Sandy is a proper comparator because none was a supervisor" and, in any event, "it is an employer's province to choose the discipline to issue an employee for inappropriate conduct,

and fact-finders are not to act as a 'super-personnel department.'" (Defs.' Mem. Supp. Mot. Summ. J. 19; 23–24 (quoting Snik v. Verizon Wireless, 160 F. App'x 191, 195 (3d Cir. 2005) (internal quotation omitted).)

      The Court is not persuaded that a reasonable factfinder could conclude that Defendants' decisions regarding other employees calling out of work due to weather is evidence of pretext, for a number of reasons.  First, there is evidence that Plaintiff was not terminated "due to Hurricane Sandy alone."  As Plaintiff points out in her Response, when Defendants conducted Plaintiff's performance review in March 2012 one of the only critiques they had for Plaintiff was to "decrease call-outs."  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. J, Plaintiff Performance Review.)  Plaintiff also notes that she used all of the sick time allotted to her between March 2011 and March 2012.[2]  (Plaintiff Dep. 129:23–130:17.)  Plaintiff asserts that Defendants' critique that she "decrease call-outs" is evidence of pretext because it was "an obvious reference to [her] health problems."  (Pl.'s Mem. Supp. Resp. Opp'n Mot. Summ. J. 6.)  Yet Plaintiff's offering of this evidence undermines her assertion that Defendants singled her out for disparate treatment from her co-workers because she was the only one terminated "due to Hurricane Sandy alone."  (Id. at 10.)  Rather, a reasonable factfinder could conclude that Plaintiff was terminated due to Defendants' request that Plaintiff "decrease call-outs" in addition to her conduct during Hurricane Sandy.

      Also, Plaintiff was not treated disparately because she was not the only employee that Defendants terminated, let alone disciplined, after she missed work due to Hurricane Sandy.  Of

---

[2] Plaintiff does not attribute her taking sick leave to the reasons why she required a chair with more lumbar support in February 2012 or why she underwent kidney surgeries in May through September 2012.  (Plaintiff Dep. 129:23–130:17.)

the other fifteen employees who called out of work during Hurricane Sandy, seven received

some form of reprimand from Defendants and two were terminated.  (Pl.'s Resp. Opp'n Mot.

Summ. J., Ex. I, Individual Performance Improvement Plans.)  Like Plaintiff, Sharee Jefferson, a

nursing assistant, was terminated after she called out during Hurricane Sandy and, like Plaintiff,

this was not the first time Defendants requested that Jefferson reduce her number of call-outs, as

she had called out a total of eighteen times and been late twenty-six times in 2012.  (Id.)

While Plaintiff's history of absences and tardiness does not appear to be as voluminous

as Jefferson's, Defendants also terminated an employee with no prior infractions documented in

the record for her conduct around the time of Hurricane Sandy.  Jenee Evans, a nursing assistant,

was terminated for being a "no show/no call" on October 26 and October 29, 2012.  (Id.; Defs.'

Resps. to Pl.'s Sec. Set of Interrogs.)  There is no evidence in the record showing that Evans was

ever told to "decrease call-outs" the same way Plaintiff had been, or that she was terminated for

any reason other than her two call-outs in October 2012.  Thus, even if Plaintiff was ostensibly

terminated "due to Hurricane Sandy alone," so, too, must Evans have been, further undermining

Plaintiff's assertion that Defendants treated her disparately.

Moreover, the fifteen other employees who called out during Hurricane Sandy were not

"similarly situated" to Plaintiff, because none of them was a supervisor.  In an employment

discrimination case, to determine whether employees are "similarly situated," the court must

look to a host of factors, including "the job function, level of supervisory responsibility and

salary."  Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305 (3d Cir. 2004).  Plaintiff's

argument that the other employees not terminated due to weather-related call-outs are similarly

situated fails because, for purposes of employment discrimination, employers are permitted to

hold employees in leadership positions to higher standards and such higher-ranked employees

13

are not "similarly situated" to their subordinates. See Monaco, 359 F.3d at 306 ("plaintiff was [not] similarly situated to . . . the eight vice presidents/branch managers whom he directly supervised"); Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 269 (W.D. Pa. 2010) (holding that "nonsupervisory employee" was not "similarly situated" to a manager); Andy v. United Parcel Serv., No. Civ.A.02-8231, 2003 WL 22697194, at *11 (E.D. Pa. Oct. 24, 2003) (finding that an employee who was not terminated after it was found he had a sexual relationship with an other employee of equal stature was not "similarly situated" to a manager who was terminated after it was discovered he had engaged in a sexual relationship with a subordinate); Osuala v. Cmty. Coll. of Phila., No. Civ.A.00-98, 2000 WL 1146623, at *7 (E.D. Pa. Aug. 15, 2000) ("[A]llegations about the failure of [employer] to discipline [plaintiff's subordinates] are inapposite.").

In her leadership position as RN supervisor, Plaintiff was responsible for the overnight operations of an eighteen-bed dementia unit and charged with supervising the other thirteen-to-fourteen employees working during the night shift. (Plaintiff Dep. 21:1–23.) One of Plaintiff's duties was speaking to subordinates over the phone regarding Defendants' practice against calling out due to weather. (Id. 139:4–8.) On occasions prior to Hurricane Sandy, Plaintiff had received instructions from Defendants "not to accept call-outs" during snowstorms. (Id. at 139:4–140:8.) Over the course of her shift on the night of October 28–29, 2012, Plaintiff received multiple phone calls from employees saying that they were calling out of work due to the inclement weather. (Id. at 136:4–138:15.) With each phone call, Plaintiff did not grant her subordinates permission to stay home because of Hurricane Sandy and duly noted Defendants' practices regarding inclement weather, telling each employee that "we were not accepting call-outs." (Id. at 139:4–8.)

14

Less than fourteen hours after the shift during which she told several subordinates that she and Defendants were "not accepting call-outs," Plaintiff phoned Defendants to say that she was calling out due to weather.  Plaintiff offered no reason for her absence other than it was "too dangerous for me to come in" and that reporting to work "was not a prudent thing to do."  (Id. at 143:12–145:19.)  Plaintiff admits that she never made any attempt to report for her shift on the night of October 29–30, 2012.  (Id. at 140:15–19.)  Plaintiff's decision to call out due to the hurricane—coming less than a day after she told multiple employees "we were not accepting call-outs"—put Defendants in the awkward position of "try[ing] to find some way that we could get around not terminating [Plaintiff] and still maintain credibility with our staff."  (Dollase Dep. 27:23–29:10.)

Under these facts, Plaintiff's suggestion that there is evidence of pretext in Defendants' decision to terminate her while not terminating her subordinates—whom she told "we were not accepting call-outs"—is unpersuasive.  There is no evidence in the record to show that any of the sixteen individuals whom Plaintiff offers as "similarly situated" had the same sort of "job function [or] level of supervisory responsibility."  Monaco, 359 F.3d at 305.  Moreover, Plaintiff violated the very practice that she had communicated to her subordinates.  Third Circuit precedent would suggest that Defendants could lawfully mete out greater sanctions to Plaintiff for doing the same thing she told her subordinates that she was "not accepting" from them.  For these reasons, Defendants' disciplinary decisions regarding all of the fifteen other employees who did not report to work during Hurricane Sandy is not evidence of pretext.

**b.     Defendants' Treatment of Another RN Who Called Out Due to Weather**

Plaintiff's offering of Defendants' discipline of fellow RN Katelyn Kirchoff as evidence

of disparate treatment is also not evidence of pretext because Kirchoff is not "similarly situated"

to Plaintiff.  Specifically, Plaintiff argues that Defendants' choice to discipline Kirchoff with

only a written warning after she missed work during a snowstorm on January 21, 2012 is

evidence of pretext for age and disability discrimination against Plaintiff.  It is true that both

Plaintiff and Kirchoff were RNs and were absent during a major weather event, and there is

nothing in the record to indicate that Kirchoff would have been in Plaintiff's protected class.

(Kirchoff Individual Performance Improvement Plan.)  A reasonable factfinder could not,

however, compare Defendants' disciplinary actions against Kirchoff in January 2012 and

Defendants' disciplinary actions against Plaintiff in October 2012 and "infer that [Defendant]

did not act for the asserted non-discriminatory reasons." Fuentes, 32 F.3d at 764 (internal

quotations omitted).

As a preliminary matter, it is unclear whether Kirchoff actually called out because of

weather.  On Kirchoff's written reprimand, just beneath Pagliaro's note that "Genesis policy

does not permit call-outs during snow or forecast of snow," Kirchoff notes under "Employee

Comments" that she called out because she was sick—not because of any snow or forecast of

snow.[3]  (Kirchoff Individual Performance Improvement Plan.)  Unlike Kirchoff, Plaintiff does

not dispute Defendants' assertion that she chose to stay home because of weather.  On the

contrary, Plaintiff states that the weather made conditions "too dangerous for [her] to come in"

---

[3] "Vomiting and diarrhea, wasn't aware of the weather forecast."  (Kirchoff Individual
Performance Improvement Plan.)

16

and that driving to work in such conditions "was not a prudent thing to do." (Id. at

143:12–145:19.) More importantly, however, there is no evidence that Kirchoff, nor any other

employee disciplined for calling out due to weather, had any supervisory responsibilities.

Conversely, it is undisputed that Plaintiff had supervisory responsibilities as the RN supervisor

for the night shift at Hillcrest. As such, Kirchoff is no more "similarly situated" to Plaintiff than

the fifteen other employees who called out during Hurricane Sandy.

For these reasons, the Court cannot find that any of Plaintiff's purported comparators

were "similarly situated" to her and, thus, cannot find that this evidence is the sort "from which a

factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

### 2.    Defendants' Treatment of Plaintiff Compared to the Employee Handbook

Plaintiff also offers Defendants' employee handbook as evidence that Defendants'

legitimate, nondiscriminatory reason for terminating Plaintiff was a pretext for age and disability

discrimination. Specifically, Plaintiff points to the graded discipline procedures for

"unscheduled absences" and "no call/no show," the lack of a written policy prohibiting call-outs

for inclement weather, and the absence of any written definition for "job abandonment."

It is true that Defendants' employee handbook does not set forth an explicit, written

policy for calling out of work due to weather, nor does it define the term "job abandonment."

(Employee Handbook.) It is also true that the handbook details graded disciplinary measures for

certain workplace misconduct. (Id.) According to the handbook, three "unscheduled absences"

within ninety days merits "Verbal Counseling." (Id.) Four instances of having three

17

"unscheduled absences" in ninety days results in "Termination of Employment." (Id.) The first offense of "no call/no show" carries with it a penalty of "Automatic Written Final Counseling." (Id.) A second "no call/no show" results in "Termination of Employment." (Id.) The first offense of "job abandonment" is deemed "Grounds for Immediate Dismissal." (Id.)

       Plaintiff asserts that, in the absence of a written definition of "job abandonment" in Defendants' employee handbook, the question of whether Plaintiff actually abandoned her job should be left to a jury. What is not in dispute, however, is the fact that Plaintiff engaged in the conduct for which she was terminated, i.e. after communicating to several subordinates that she was "not accepting call-outs," she did not return to work for her next shift for no reason other than she deemed it "not a prudent thing to do." (Plaintiff Dep. 139:4–8; 143:12–145:19.) In light of these undisputed facts, in addition to the latitude that the law grants to employers to hold supervisors to a higher standard than their subordinates, the Defendants' employee handbook does not provide evidence from which a reasonable factfinder could "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

       Plaintiff cites to three cases in support of her argument that the question of whether she actually abandoned her job should be left to the jury. Each of these cases is distinguishable from the facts in this matter. In Boles v. Wal-Mart Stores, No. Civ.A.12-1762, 2014 WL 1266216 (D.N.J. Mar. 26, 2014), a dispute arose over whether plaintiff had sent her supervisor a text message indicating her intent to return to work, and therefore a jury could "reasonably believe that Defendant had notice that Plaintiff intended to return to work, and thus had no basis to terminate him for job abandonment." Id. at *30. Here, Plaintiff did not communicate to

18

Defendants any intent to return to work, and the last communication Plaintiff had with her

superiors prior to her termination was her phone conversation with Dollase in which she said she

would not to return to work on the evening of October 29–30, 2012. (Plaintiff Dep.

145:4–146:24; Dollase Dep. 21:15–23:8.) In both Arismendez v. Nightingale Home Health

Care, Inc., 493 F.3d 602 (5th Cir. 2007), and Swift v. Bank of America, No. Civ.A.08-35-B-W,

2009 WL 723521 (D. Me. Mar. 16, 2009), the employer set forth a written definition of the term

"job abandonment" and the employee made some objective manifestation of an intent to return

to work after taking a leave of absence due to surgery, leading the court to rule that a reasonable

factfinder could find that the employee had not committed "job abandonment" as the employer

had defined it. Arismendez, 493 F.3d at 609; Swift, 2009 WL 723521 at *7–8, *16. Here, not

only is there no employee handbook definition against which a factfinder could measure

Plaintiff's conduct, but it is also undisputed that Plaintiff stayed home due to a weather event,

not to recover from surgery.

In the absence of a written definition of "job abandonment," Plaintiff provides the

dictionary definition of "to abandon" as "to leave and never return to." (Mem. Supp. Pl.'s Resp.

Opp'n Mot. Summ. J. 13 (citing Merriam-Webster.com, Merriam-Webster, "Abandon," (Aug. 7,

2014, 1:00 PM), http://www.merriam-webster.com/dictionary/abandon).)[4]  It is undisputed that

Plaintiff left her job on October 29, 2012.  It is also undisputed that she never returned, nor made

any manifestation of her intent to return prior to her termination. Nothing in or about the

employee handbook provides any evidence from which a reasonable factfinder could disbelieve

---

[4] Notably, Merriam-Webster also defines "to abandon" as "to leave (a place) because of danger."
(Id.)

that "job abandonment" was the reason for Plaintiff's termination or believe that an invidious discriminatory reason was a factor in Plaintiff's termination.

### 3.   Conclusion as to ADA, ADEA, and PHRA Claims

Defendants' decision to terminate Plaintiff may have been harsh.  It is not, however, the province of this Court to "sit as a super-personnel department that reexamines an entity's business decisions," Brewer v. Quaker State Oil Refining Co., 72 F.3d 326, 332 (3d Cir. 1995), or conduct "an independent assessment of how we might evaluate and treat a loyal employee." Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988).  The ADA, ADEA, and PHRA are "not intended to be a vehicle for judicial second-guessing of business decisions." Id.  Rather, at this juncture, the Court's inquiry must be confined to whether Plaintiff has produced evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. After examining the record in full and considering the totality of the circumstances surrounding Plaintiff's termination, the Court cannot find that Plaintiff has met her burden of proof. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's ADA, ADEA, and PHRA claims.

### B.   Plaintiff's FMLA Claims

Plaintiff brings an FMLA interference claim against Defendants.  "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (citing Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005)). "As the Third Circuit has explained, '[a]n interference action

is not about discrimination, it is only about whether the employer provided the employee with

the entitlements guaranteed by the FMLA.'" Atchison v. Sears, 666 F. Supp. 2d 477, 488 (E.D.

Pa. 2009) (citing Callison, 430 F.3d at 120). "Because the FMLA is not about discrimination, a

McDonnell Douglas burden-shifting analysis is not required." Naber v. Dover Healthcare

Assocs., Inc., 765 F. Supp. 2d 622, 647 (D. Del. 2011).

Here, it is undisputed that Defendants did not prevent Plaintiff from taking FMLA leave.

In Plaintiff's deposition, when asked to enumerate the ways in which Defendants interfered with

her ability to take FMLA leave, Plaintiff responded that "they did not interfere." (Plaintiff. Dep.

169:19–22.) Plaintiff does not point to any other evidence to support an FMLA interference

claim. Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to

Plaintiff's FMLA interference claim.

Plaintiff also brings an FMLA retaliation claim against Defendants. The FMLA makes it

unlawful "for any employer to discharge or in any other manner discriminate against any

individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

This portion of the FMLA prohibits retaliation by an employer for the employee's exercise of

rights under the FMLA. As with other retaliation claims, the Court utilizes the burden-shifting

McDonnell Douglas burden-shifting framework in analyzing such a claim under the FMLA. See

Sherrod v. Phila. Gas Works, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002).

To establish a prima facie case of retaliation under the FMLA, Plaintiff must show that:

(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment

action; and (3) a causal connection exists between the adverse action and Plaintiff's exercise of

her FMLA rights. Alifano v. Merck & Co., 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001);

Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999). Defendants concede

21

for purposes of their pending motion that Plaintiff engaged in a statutorily protected activity and that her termination was an adverse employment action. Defendants argue, however, that Plaintiff cannot establish a causal connection between her discharge and her FMLA leave.

"A causal connection between an employee's protected activity and an adverse action by her employer may be inferred if the events occurred close in temporal proximity to each other." Harris v. SmithKline Beecham, 27 F. Supp. 2d 569, 580 (E.D. Pa. 1998), aff'd 203 F.3d 816 (3d Cir. 1999). In the present case, Plaintiff relies on the temporal proximity between her leave and her termination to demonstrate a causal connection, noting she was fired approximately one month after her return from leave in September 2012.

It is well-established that "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" Cullison v. Dauphin Cnty., No. Civ.A.10-705, 2012 WL 3026784, *8 (M.D. Pa. Jul. 24, 2012) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). By itself, without further evidence of a causal link, "one month . . . is not an unusually suggestive amount of time." Schummer v. Black Bear Distrib., LLC, 965 F. Supp. 2d 493, 498–99 (D.N.J. 2013). The Third Circuit has held that absent an unusually suggestive temporal proximity, a causal link between a protected activity and an adverse action may be inferred from "an intervening pattern of antagonism following the protected conduct, or the proffered evidence examined as a whole." Peace-Wickham v. Walls, 409 F. App'x 512, 522 (3d Cir. 2010).

Nonetheless, a causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events, including "job abandonment" by the employee. See Weiler v. R&T Mech., Inc., 255 F. App'x 665, 668–69 (3d Cir. 2007) (causal link between plaintiff's report of sexual harassment and plaintiff's termination

22

was broken where plaintiff—a general supervisor for an industrial contractor—abandoned her job site); Calero v. Cardone Indus., Inc., No. Civ.A.11-3192, 2012 WL 2547356, at *10 (E.D. Pa. Jun. 29, 2012) (causal link between plaintiff's FMLA leave and plaintiff's termination was broken where plaintiff—a factory worker—lied to his employer about his arrival times); Naber, 765 F. Supp. 2d at 639 (causal link between plaintiff's request for FMLA leave and plaintiff's termination was broken where plaintiff—a recreation assistant at a nursing home facility—falsified records).

Plaintiff attempts to bolster her assertion of a causal link between her taking FMLA leave and her termination by pointing to two instances in which her supervisor Susan Pagliaro made reference to the possibility of Plaintiff's retirement. Specifically, Plaintiff asserts that sometime in or around 2011, Pagliaro told her that she "may want to consider retiring" and again broached the subject while Plaintiff was recovering from kidney surgeries during her FMLA leave in September 2012. (Plaintiff Dep. 165:5–166:19.)

Here, however, Plaintiff returned from FMLA leave on September 28, 2012. (Plaintiff Dep. 100:8–10.) Plaintiff decided to call out due to Hurricane Sandy on October 29, 2012. (Id. at 143:12–145:19.) Defendants deemed Plaintiff's conduct to be "job abandonment" and terminated Plaintiff on November 1, 2012. (Plaintiff's Performance Improvement Plan.) Even assuming—for purposes of the pending motion only—that Pagliaro's stray remarks and the the one-month span between Plaintiff's return from FMLA leave and Plaintiff's termination were evidence of a "causal link," Plaintiff broke the causal link when she undisputedly engaged in conduct that went against a known practice of Defendants' and for which Defendants say they terminated her.

23

The Court cannot find that Plaintiff has met her burden to establish a prima facie case for FMLA retaliation because she cannot show a causal link between her taking FMLA leave and her termination. Accordingly, the Court will grant Defendants' motion as to Plaintiff's FMLA retaliation claim.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment.

An appropriate order follows.

24